## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DR. LARRY MORRIS,**

               **Plaintiff,**

      **v.**                                  **Case No. 2:18-cv-543**
                                          **CHIEF JUDGE ALGENON L. MARBLEY**
                                          **Magistrate Judge Deavers**

**MARY RUTAN HOSPITAL,**

               **Defendant.**

## <u>OPINION AND ORDER</u>

This matter is before the Court upon Defendant Mary Rutan Hospital's Motion for Summary Judgment on Plaintiff's remaining claims of his Second Amended Complaint: Counts I, II, and V. (ECF No. 33). Plaintiff Dr. Larry Morris filed a Response in Opposition (ECF No. 41) and Defendants replied (ECF No. 47). For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.      BACKGROUND

Plaintiff, Dr. Larry Morris has been a licensed physician in the State of Ohio since 1975. (ECF No. 37, Morris Dep. at 52). Defendant Mary Rutan Hospital (hereinafter "Defendant" or "MRH") is a not-for-profit corporation located in Bellefontaine, Ohio. Dr. Morris began working as an independent contractor for Defendant in 2004 and was hired as a full-time general surgeon in 2009. (*Id*. at 47). In 2009, Defendant's Chief Executive Officer, Amanda Goble, presented Dr. Morris with an employment contract at his requested salary of $250,000. (ECF No. 35, Goble Dep. at 21–22). Dr. Morris was 66 years old. Plaintiff's employment contract was subject to

additional one-year renewal terms unless either party elected to provide notice of termination. (ECF No. 12-3, Employment Agreement § 4.1).

From 2009 through 2017, Dr. Morris's employment contract was renewed each year. (ECF No. 37, Morris Dep. at 71–73). At the time of his last contract renewal, Dr. Morris was 73 years old. Dr. Morris' salary increased over the years to $330,000. (*Id*. at 82–83). In 2014, Dr. Morris requested to scale back his practice to spend more time with his family. (*Id*. at 86). However, Dr. Morris found it difficult to provide effective care to his patients on a part-time basis, so he returned to full-time employment in 2016. (*Id*. at 92–93). Defendant agreed to return Dr. Morris to full-time employment as a general surgeon but reduced his salary to $264,000. (*Id*. at 94).

Defendant's CEO explained that each time a surgeon's contract was renewed, MRH reviewed salary surveys and data compiled by a national, not-for profit organization called the Medical Group Management Association ("MGMA")—the largest surveyor and monitor of physician salaries and performance from a fair market value perspective. (ECF No. 35, Goble Dep. at 13–19, 41). Each year, the MGMA surveys contain a line item based on specialty (for example, General Surgery) that states the mean salary across the country based on Relative Value Unit ("RVU") production in the 10th, 25th, 50th and 90th percentiles. (*Id*. at 17). MRH then sets base salaries for physicians based on where the physicians' RVU production falls relative to those percentiles. (*Id*.). Thus, for established surgeons, compensation is dictated by RVUs (i.e., a surgeon's workload productivity based on the number of surgical procedures, office visits, etc. that are completed). If a physician produces RVUs at the 25th percentile, his or her salary is paid at the 25th percentile amount listed in the MGMA survey. (*Id*. at 41).[1] Age and years of experience

---

[1] For non-established physicians (like those just coming out of residency or those formerly in private practice with no documented RVU history), the Hospital has no way of matching the physician's productivity to a particular RVU percentile under the MGMA survey. In such situations, the Hospital sets a physician's salary between the 25th and 50th percentile, but includes a provision in the physician's

are not considered by the MGMA in completing its survey.  (*Id*. at 17).  According to Goble, Plaintiff was producing at the 10th percentile, so his salary was tied to the 10th percentile General Surgeon salary noted in the MGMA survey.  (*Id*. at 40–41).

In March of 2017, Plaintiff performed a lower bowel surgery on a 56-year-old patient who had experienced diverticulitis involving the sigmoid colon for several months before being admitted to MRH for treatment.  (ECF No. 37, Morris Dep. at 109–110).  The patient was first seen and treated by Dr. Grothaus, who consulted with Dr. Morris.  The two surgeons evaluated the patient and were uncertain whether the inflammation in the patient's intestine was being caused by an infection, or a cancerous tumor, so Dr. Grothaus performed a colonoscopy.  (*Id*. at 111).

After the colonoscopy, the doctors were still uncertain as to what was causing the patient's narrowing of the colon.  Therefore, they decided colon surgery would be necessary to remove part of the patient's sigmoid colon.  (*Id*. at 110–112).  Dr. Morris described the surgery as difficult because of the patient's medical history, excessive scarring in the involved areas, and the severity of his symptoms.  (*Id*. at 113).  The surgery lasted for six hours.  (*Id*. at 116).  Following the surgery, the patient seemed to be recovering well and was discharged from MRH after six or seven days.  (*Id*. at 117–118).  Before the patient left MRH, he told Dr. Morris that he felt better than he had in six months.  (*Id*. at 133).

Approximately twelve hours after the patient was discharged, he returned to MRH experiencing shortness of breath and low blood pressure.  (*Id*. at 119).  Dr. Beisler, the on-call surgeon at that time, evaluated the patient.  (*Id*. at 119–120).  After a CT scan, hospital staff began to prepare the patient for surgery; however, the patient suffered cardiac arrest and died before the

---

employment contract allowing the Hospital to decrease the physician's salary after a two year period if the RVUs established by the physician during that time do not fall in the 25-50th MGMA percentile. (ECF No. 35, Goble Dep. at 15-16, 41).

surgery could be performed. (*Id*.). MRH did not conduct any type of postmortem examination, surgery, or autopsy to determine the patient's cause of death. (*Id*. at 124; *see also* ECF No. 36, Varian Dep. at 44).

Shortly after the patient's death, MRH's Medical Director, Dr. Grant Varian, was informed of the news. (ECF No. 36, Varian Dep. at 35). After speaking to the on-call physician and reviewing the case, Dr. Varian became concerned and started a review of the patient's death through MRH's Medical Staff Quality Committee ("MSQC").[2] (*Id*. at 35–36, 39). During the investigation, Plaintiff was placed on paid administrative leave. (ECF No. 37, Morris Dep. at 128; ECF No. 35, Goble Dep. at 54). Plaintiff opined that the MSQC investigation was not typical. (ECF No. 37, Morris Dep. at 41). "What is typical for an MSQC investigation is to look at the merits of the case, the circumstances of the case, and determine what additional information is needed to make a judgment." (*Id*.). Ultimately, Dr. Varian opted to have an outside peer review of this case conducted by three general surgeons from three different hospitals. Plaintiff did not know the peer reviewers but agreed that they were qualified to conduct the review. (ECF No. 37, Morris Dep. at 100–01, 130–32; ECF No. 36, Varian Dep. at 37).

Neither Dr. Morris, nor the surgical staff were consulted during the investigation. The MSQC determined that patient's cause of death was failure of the primary anastomosis, peritonitis, and sepsis. (*Id*. at 38). Dr. Morris, however, believes:

> There's a lot of questions about what caused this patient's death. I think probably its more likely this patient died from a pulmonary embolus. The reason I say this is the patient had a very rapid downhill course over a matter of a few hours where he lowered his blood pressure and died. When you have a leaking anastomosis – I've been practicing for forty years. I've done and seen a lot of colon surgeries and,

---

[2] The MSQC is a group of physicians and surgeons from varying specialties that function as a peer review committee overseeing the care by medical personnel at MRH. (ECF No. 36, Varian Dep. at 25). The MSQC reviews cases presented to it that involve irregularity or an unexpected outcome to determine if the outcome is related to the care provided and to make decisions about whether an intervention is required. (*Id*. at 14–15).

of course, have seen some of the connections leak.  When that occurs, people get –
it's almost like a ruptured appendix, they begin to get peritonitis, they begin to get
tenderness in their abdomen, they begin to have a lot of pain, they seek help rather
quickly.  That condition is usually treated with a temporary colostomy and those
patients usually survive.  Even for an elderly patient, it would be very unusual to
have a patient in a matter of ten or eleven hours go from feeling – this man told me
he felt better than he had in six months right before he left the hospital.  To go from
that situation to death in a matter of eleven, twelve, thirteen hours is quite unusual
for a leaking anastomosis.

A pulmonary embolus is a clot – you understand what that is, it's a clot that comes
usually from your legs, goes to your heart, blocks both of the arteries going to the
lungs so that no blood can flow through those arteries.  What that does is cause
shortness of breath, causes a low blood pressure because no blood is able to
circulate, and rather quickly in the severe situations it will cause death.

This man had had three total knee replacements, I believe it was his left knee, in a
period of a year and a half prior to coming to us.  Those procedures predispose one
to phlebitis, in addition to the operative procedure that we carried out.  So it's very
possible that he had pulmonary embolus.

(ECF No. 37, Morris Dep. at 135–137).

After the investigation was completed, Dr. Varian, Ms. Goble, and Terry Stolly,

Defendant's legal counsel, met with Dr. Morris on or around April 28, 2017, and informed him

that based on the results of the investigation, he would need to complete certain requirements to

continue to practice medicine at MRH.  (ECF No. 37, Morris Depo. at 140–41; ECF No. 35, Goble

Depo. at 55).  Specifically, the MSQC recommended the following:

1.      Dr. Morris voluntarily submit to a neuropsychological evaluation.  The
physician conducting the evaluation shall be approved by the MSQC.  A written
report of such evaluation shall be delivered to the MSQC, c/o Dr. Varian.

2.      Dr. Morris voluntarily submit to a physical examination and a written report
of such examination shall be delivered to the MSQC, c/o Dr. Varian.  Dr. Morris
may select the physician of his choice for the physical examination.

3.      Dr. Morris shall voluntarily take a course on medical record documentation.
The course shall be approved by the MSQC and Mary Rutan Hospital
Administration.

4.      Until items 1-3 are completed and approved by the MSQC and Mary Rutan Hospital Administration, Dr. Morris shall voluntarily not perform any surgeries.

Note:  If Dr. Morris fails or refuses to comply with and satisfy items 1-4, the MSQC shall recommend to the MEC that all of his surgery privileges be revoked.

5.      Once items 1-3 are satisfactorily complete, Dr. Morris may either:
a.  Voluntarily agree to not perform any more lower bowel surgeries at Mary Rutan Hospital; or
b.  Dr. Morris shall only perform lower bowel surgeries with a proctor, who shall be selected by the MSQC and credentialed by the Medical Staff Office. Dr. Morris shall be proctored on at least ten (10) lower bowel surgeries.  If, after those proctored cases, the proctor states, in writing, that Dr. Morris is performing lower bowel surgeries within the standard of care, Dr. Morris may continue to perform lower bowel surgeries at Mary Rutan Hospital if approved by the MSQC.

6.      Commencing on the date that Dr. Morris performs his first surgery following his voluntary decision to not perform any surgery pending satisfactory completion of items 1-3, Dr. Morris shall be under a six (6) month Focused Professional Practice Evaluation (FPPE).  It [sic] shall focus on, among other factors, clinical decisions, length of surgeries, lengths of stay post-surgery, and documentation.

(ECF No. 36–3, Varian Dep. Exhibit No. 3).

Dr. Morris states that he was blindsided by the restrictions.  He believed that MRH was essentially terminating him.  (ECF No. 37, Morris Dep. at 151).  Prior to this incident, Dr. Morris had done hundreds of lower bowel surgeries with a very acceptable complication rate.  And had performed twenty-seven consecutive colon procedures where the colon was reconnected without any leakage.  (*Id.*).

When questioned about the physical examination requirement, Dr. Varian stated that under these circumstances it is routine to evaluate somebody's general fitness – physical and emotional. (ECF No. 36, Varian Dep. at 49).  However, Dr. Varian could not recall any prior occasion when the MSQC required a surgeon to undergo a physical examination in order to continue practicing.

(*Id*. at 51).  Dr. Varian could not point to anything particular about this event that prompted the MSQC to require a neuropsychological evaluation and a physical evaluation.  (*Id*. at 55–56).

Dr. Morris submits that these restrictions essentially forced him out of practice.  (ECF No. 37, Morris Dep. at 144).  On or around May 17, 2017, a letter terminating Dr. Morris's employment contract was sent to him for signature.  (*Id*. at 175).  Dr. Morris refused to sign the agreement to terminate his contract, because he neither resigned, nor terminated his employment contract.  (*Id*. at 175, 177).  However, MRH was operating under the assumption that Dr. Morris was retiring because he and Ms. Goble had agreed to an end date.  MRH even published an advertisement in the local paper regarding Dr. Morris' retirement.  (*Id*. at 180).  Dr. Morris was not notified of the advertisement prior to its publication, nor did he approve of its publication.  (*Id*.).

Dr. Morris submitted a charge of discrimination based on age and perceived disability to the Equal Employment Opportunity Commission ("EEOC") on August 28, 2017.  On March 20, 2018, the EEOC issued Dr. Morris a Notice of Right to Sue stating that it was terminating its processing of Dr. Morris's charge.  (ECF No. 12–2, Notice of Right to Sue).  Dr. Morris timely commenced this action on June 4, 2018.  (ECF No. 1, Compl.).  He then filed a Second Amended Complaint on September 19, 2018.  (ECF No. 19, Second Am. Compl.).  On March 19, 2019, this Court granted MRH's Motion to Dismiss Counts III, IV, VI, and VII.  (ECF No. 26, Mar. 19, 2019 Op. & Ord.).  Plaintiff's remaining claims allege: age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") (Count I); breach of contract (Count II); perceived disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") (Count III); perceived disability discrimination under Ohio Revised Code § 4112.02 (Count IV); requiring that Morris undergo unlawful medical examinations in violation of the ADA (Count V); retaliation for engaging in activity protected by the ADA (Count VI); and

retaliation for engaging in activity protected by Ohio Revised Code Chapter 4112 (Count VII). (ECF No. 19, Second Am. Compl.). Defendant MRH now moves for summary judgment on the remaining claims.

## II. STANDARD OF REVIEW

Defendant MRH moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

## III.    LAW AND ANALYSIS

Plaintiff's remaining claims in his Second Amended Complaint allege age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") (Count I); breach of contract (Count II); and a violation of the Americans with Disabilities Act ("ADA") for requiring Dr. Morris to undergo unlawful medical examinations (Count V). Defendant MRH moves for summary judgment on each of these claims.

### A.    Age Discrimination in Employment Act

The ADEA prohibits employers from discriminating against individuals in their employment on the basis of age. The ADEA provides in relevant part that "[it] shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To maintain a claim of age discrimination, a plaintiff must present some credible evidence, either direct or circumstantial, that age was the but-for cause of his termination. *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167 (2009).

9

Plaintiff has not provided any direct evidence of age discrimination. Plaintiff asserts he can establish a *prima facie* case of age discrimination under the *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Supreme Court held in *Gross* that in an age discrimination case, a plaintiff must show that his or her age was the "but-for" cause of the challenged adverse employment action, not just a motivating factor. *Gross*, 557 U.S. at 177–78. Following *Gross*, the Sixth Circuit explained that the *McDonnell Douglas* framework remains useful in analyzing circumstantial evidence in ADEA claims. *See Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). To state a *prima facie* case, a plaintiff must establish that: 1) he was a member of a protected class; 2) he was discharged; 3) he was qualified for the position held; and 4) he was replaced by someone outside of the protected class. *McDonnell Douglas,* 411 U.S. at 802.

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 804; *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008). If the employer meets this burden, the burden shifts back to the plaintiff to show that the employer's explanation was a mere pretext for intentional age discrimination. *Id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The burden of persuasion, however, remains on the ADEA plaintiff at all times to demonstrate "that age was the 'but-for' cause of their employer's adverse action." *Geiger*, 579 F.3d at 620 (*quoting Gross*, 557 U.S. 167, n.4). The Sixth Circuit has held that a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when it is analyzing the plaintiff's *prima facie* case. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc). Further, the Sixth Circuit has held that in the context of explaining what establishes a *prima facie*

10

case of age discrimination that the *McDonnell Douglas prima facie* elements are not to be applied "mechanically, instead opting for a case-by-case approach that focuses on whether age was in fact a determining factor in the employment decision." *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

The Court will now apply the aforementioned standard to Plaintiff's claim for age discrimination.

### 1.    Prima Facie Case

Plaintiff Dr. Morris alleges that Defendant compensated him less, terminated his employment, and treated him less favorably than younger employees based on his age in violation of the ADEA.  As a preliminary matter, there is no dispute that Plaintiff was a member of the protected class.  Further, Defendant does not contest the third element of the *prima facie* case, that Dr. Morris was a qualified general surgeon.

### a.    Adverse Employment Action

Dr. Morris alleges that he was subjected to an adverse employment action "when [MRH] imposed the restrictions upon him by the MSQC which terminated his medical privileges. Specifically, Defendant would not allow Dr. Morris to practice medicine unless he completed a neuropsychological evaluation by a physician approved by the MSQC," had "a physical examination," and completed "a course on medical record documentation."  (ECF No. 41, Pl.'s Resp. at 19).  Defendant MRH argues that Plaintiff cannot establish a claim for age discrimination because he was not terminated, and the recommendations made by the MSQC were not adverse employment actions.

Plaintiff may establish an adverse employment action by demonstrating that he was constructively discharged.  *See Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886-87 (6th Cir. 1996).

To demonstrate a constructive discharge, a plaintiff must adduce evidence to show that 1) "the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person," and 2) the employer did so "with the intention of forcing the employee to quit . . . ." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). In *Wilson v. Firestone Tire & Rubber Co.*, the Sixth Circuit held that "[a] demotion within a company does not amount to a constructive discharge unless the proffered employment options would have been 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" 932 F.2d 510, 515 (6th Cir. 1991) (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir. 1987); *Held*, 684 F.2d at 432. In *Scott v. Goodyear Tire & Rubber Co.*, the Sixth Circuit stated that "in the typical discriminatory constructive discharge case, the employer does not overtly seek a discontinuation in the employment relationship but the employee claims to be subjected to intolerable working conditions due to discriminatory behavior." 160 F.3d 1121, 1127 (6th Cir. 1998).

The Court must closely examine Plaintiff's claims and evidence to determine if Plaintiff was subjected to "intolerable working conditions due to his age." Plaintiff asserts that he did not resign and states that "there is simply no documentation from Dr. Morris in the record where he ever indicated an intent to resign." (ECF No. 41, Pl.'s Resp. at 18). Plaintiff further argues:

> Defendant would not allow Dr. Morris to practice medicine unless he completed a neuropsychological evaluation by a physician approved by the MSQC, and then produce a written report of the evaluation to the MSQC, c/o Dr. Varian. Defendant's MSQC also required Dr. Morris to submit to a physical examination, and complete a course on medical record documentation. Dr. Morris was not permitted to perform any surgeries until he completed the above medical examinations and record course. The MSQC noted that if Dr. Morris "failed" or

refused to comply with its restrictions, then the MSQC would recommend that his surgery privileges be revoked.

(*Id*. at 19).

Once Dr. Morris completed the first stage of restrictions, the MSQC then required him to either:

> (1) voluntarily agree not to perform any more lower bowel surgeries at Mary Rutan Hospital; or (2) Only perform lower bowel surgeries with a proctor, who shall be selected by the MSQC and credentialed by the Medical Staff Office.  Dr. Morris shall be proctored on *at least* ten (10) lower bowel surgeries. If, after those proctored cases, the proctor states, in writing, that Dr. Morris is performing lower bowel surgeries within the standard of care, Dr. Morris may continue to perform lower bowel surgeries at Mary Rutan Hospital *if approved by the MSQC*."

(*Id*. at 19-20) (emphasis in original).

Plaintiff's contention is:

> [I]n essence, Dr. Morris was given the ultimatum to either quit, or be terminated by continuing to work under the extreme supervision and scrutiny of the MSQC, all while the MSQC retained its sole discretion to terminate Dr. Morris's privileges throughout that time.  The MSQC knew these restrictions upon Dr. Morris would be challenging to complete. The MSQC maintained sole discretion in determining who would proctor Dr. Morris's surgeries, how many surgeries would be proctored, and whether he would have the ability to continue performing surgeries even after completing all requirements.  Dr. Morris openly opposed the restrictions, because MRH had no basis for imposing them, they were unreasonable, unfair, and essentially terminated his privileges.

(*Id*. at 20).

Plaintiff only offers his own testimony in support of his position.[3]  He asserts that it would be nearly impossible for him to handle emergency surgeries because he was the only lower bowel surgeon in the area.  However, Plaintiff never returned to work following the imposition of those requirements.  There is no evidence that Plaintiff's privileges were revoked, nor that he attempted

---

[3]  Plaintiff's self-serving testimony is the only evidence he offers to suggest that he was unfairly treated because of his age; he offers no statements from others that suggest that his age was a factor in the decision to impose additional requirements on him.  Such self-serving and conclusory allegations are insufficient to overcome a motion for summary judgment.  *Anderson*, 477 U.S. at 248.

to perform a surgery and was unable to.  The MSQC was responsible for selecting the proctor, not Plaintiff.  He could have returned to work and it would have been Defendant's responsibility to have a proctor available.  In addition to his own testimony, Plaintiff offers the testimony of Ms. LeVan and Dr. Varian in support of his position that the neuropsychological and physical examinations were not necessary.  However, Plaintiff has not offered any evidence to suggest that the requirements were imposed based on Plaintiff's age.  Imposition of medical examinations and inquiries is permitted, although, "an employer's discretion to order employees to undergo examinations is hardly unbounded."  *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999).  In the post-hiring context, "demands for examinations can only be made where shown to be 'job-related and consistent with business necessity.'"  *Id.* (quoting 42 U.S.C. § 12112(d)(4)(A)).

Further, Plaintiff's belief that his surgery record was stellar, and did not justify the requirements imposed, is irrelevant to his claim of age discrimination.  "As a matter of law, a Title VII plaintiff's contention that he was better qualified than the workers who were retained, is insufficient to establish a *prima facie* case.  It is the employer's motivation that is the key factor, not the employee's perception."  *Mitchom v. HCA Mgmt. Serv., L.P.*, No. 3:08-1224, 2009 U.S. Dist. LEXIS 107353 (M.D. Tenn. Nov. 17, 2009) (finding that a plaintiff's contention that layoffs should have been based on seniority and experience insufficient to support a *prima facie* case of discrimination); *Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006) ("Whether Browning agrees with Courtney's scoring method, or whether he believes that he was more qualified for the position that Rhodus ultimately filled, is irrelevant to the age-discrimination inquiry-what matters is Courtney's perception of Browning's qualifications.").

Finally, the fact that Plaintiff was one of the oldest physicians on staff is not sufficient to establish a *prima facie* case of age discrimination. *See Almond v. ABB Industrial Sys., Inc.*, 56 Fed. App'x. 672, 675 (6th Cir. 2003) (finding that the fact that the terminated employee was the oldest in his department was insufficient to establish a *prima facie* case under the ADEA); *see also Bynum v. Fluor Fernald, Inc.*, No. C-1-04-361, 2006 U.S. Dist. LEXIS 7796, at *20–21 (S.D. Ohio Mar. 1, 2006) (Weber, J.) (finding that plaintiff terminated in a reduction in workforce case could not establish *prima facie* case of age discrimination showing that she was the oldest employee in the group within which she was considered for the reduction in workforce and that younger employees were retained); *Dabrowski v. Warner-Lambert Co.*, 815 F.2d 1076, 1078–79 (6th Cir. 1987) (stating that "[t]his court has long recognized that the mere fact that a younger employee or applicant receives better treatment than an older one is insufficient to carry the burden of proof in a case under the federal Age Discrimination in Employment Act"; holding that the plaintiff employee's evidence showed little more than that employer hired persons younger than the plaintiff).

The Court finds that mere imposition of the additional requirements as a condition of Plaintiff's employment does not constitute an adverse employment action. The imposition of the requirements was not a constructive discharge. *See Sullivan*, 197 F.3d at 813 (finding that "an examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination."). Even if the conditions imposed on Dr. Morris were intolerable and difficult to operate under, he has not offered any evidence to show that the requirements were imposed due to his age. The additional requirements were imposed by an independent panel of doctors as a result of the death of one of Dr. Morris' patients. The Court concludes that Plaintiff has not experienced an adverse employment action.

## 2. Legitimate Non-discriminatory Reason

Even assuming that Plaintiff could establish a *prima facie* case of age discrimination, his claim still fails because he has failed to show that MRH's legitimate non-discriminatory reason is pretext for discrimination. MRH explains that it imposed the additional requirements on Plaintiff following the death of one of Plaintiff's patients and an independent review by a panel of doctors. MRH has therefore satisfied its burden of articulating a legitimate non-discriminatory reason for its conduct.

## 3. Pretext

Plaintiff has not met his burden of establishing that MRH's proffered reasons are a pretext for unlawful age discrimination. To establish that an employer's legitimate, nondiscriminatory reason for an adverse employment action is pretextual, a plaintiff may show that: "(1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate his [termination], or (3) they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them if the reasons independently cause [the] employer to take the action it did) are not true.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir. 1998) (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)). "[A] reason cannot be pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d at 285 (alteration omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Irrespective of the method a plaintiff uses to rebut a defendant's reasons, the plaintiff "always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant intentionally discriminated against h[er]." *Id.* (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (internal quotations omitted and alterations in original). When assessing the evidence provided by the parties, the Court is to be mindful that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Parkhurst v. Am. Healthways Servs., LLC*, 700 F. App'x 445, 449 (6th Cir. 2017) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)) (alteration in original and internal quotations omitted).

Dr. Morris asserts that MRH's proffered reason for termination was pretextual because it failed to follow "its own sentinel event procedure with regard to Dr. Morris's investigation" because Defendant did not "conduct a thorough root cause analysis to determine the patient's cause of death" as required under Defendant's policy. (ECF No. 41, Pl.'s Resp. at 22). Dr. Morris further submits that MRH's reason for imposing the MSQC's recommendation were pretextual because Defendant failed to review Dr. Morris' historical record. (*Id.*).

In response, MRH asserts the honest belief defense. (ECF No. 33, Def. Mot. for Summ. J. at 28). The honest belief rule was initially developed by the Seventh Circuit and "provides that so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (citing *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997); *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992); *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559–60 (7th Cir. 1987)).

The Sixth Circuit has somewhat modified the honest belief rule. Under the Sixth Circuit's test "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Blizzard v. Marion Tech. Coll.*, 698 F.2d275, 286 (6th Cir. 2012) (citing *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010)). But when "determining whether an employer 'reasonably relied on the particularized facts then before it,'" the Court does "'not require that the decisional process used by the employer be optimal or that it left no stone unturned.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2012); *see also Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005). And the Sixth Circuit has expressly rejected the Seventh Circuit's application of the honest belief rule to the extent it "credits an employer's belief without requiring that it be reasonably based on particularized facts rather than on ignorance and mythology." *Smith*, 155 F.3d at 806. The Sixth Circuit noted: "The rationale behind the rule is that the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer lacks the necessary discriminatory intent." *Id.*

If the employer meets this burden, the burden then shifts to the employee to "produce 'proof to the contrary' that challenges the foundation of the employer's belief or lose on summary judgment." *Hardesty v. Kroger Co.*, 758 F. App'x 490, 493 (6th Cir. 2019) (citing *Smith*, 155 F.3d at 807); *see also Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (finding that "[i]f there is no material dispute that the employer made a reasonably informed and considered decision that demonstrates an honest belief . . . the case should be dismissed[.]") (internal quotations omitted). However, "[d]isputing facts is not enough—instead, the plaintiff must produce evidence

18

'demonstrat[ing] that the employer did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action.'" *Block v. Meharry Med. Coll.*, 723 F. App'x 273, 280 (6th Cir. 2018) (quoting *Braithwaite*, 258 F.3d at 494). But while the Court "will not 'micro-manage the process used by employers in making their employment decisions,' [the Court] also will not 'blindly assume that an employer's description of its reasons is honest.'" *Id.* (quoting *Smith*, 155 F.3d at 807).

MRH has offered evidence that it reasonably relied on the particularized facts before it. MRH's Medical Director reviewed the case of Dr. Morris's patient's death within 24-hours of his discharge from MRH. After this review, MRH's Medical Director "expressed concern" and began a review of the patient's death through the MSQC. MRH also had three General Surgeons from other hospitals to conduct an independent evaluation of the care the deceased patient received from Dr. Morris. Following the conclusion of these investigations, MRH adopted the MSQC's findings, including requiring a proctor to observe Dr. Morris conduct lower bowel surgeries to restore the Hospital's confidence in his ability to do so.

The burden now shifts to Dr. Morris to come forward with evidence that challenges the foundation of MRH's belief. Dr. Morris asserts that there remains a genuine issue of fact over whether MRH "followed its policy by investigating a sentinel event[;]" and submits that he has proffered "evidence that the MSQC investigation and recommendations were done as a way to force" his termination. (ECF No. 41, Pl.'s Resp. at 23).

Plaintiff argues that the fact that no one reviewed Dr. Morris's records, leak rates, or prior cases, but solely relied on the outside peer reviews establishes pretext.  Plaintiff again argues that MRH had no legitimate basis for imposing the new requirements on him.  Plaintiff continues to question MRH's policy in investigating a sentinel event and why an autopsy was never conducted.  But Plaintiff has failed to proffer any evidence that MRH did not sincerely believe in its reason for his termination.

It is not the Court's role to question why an autopsy was not conducted, whether the patient's cause of death was determined, or whether the MSQC committee discussed Plaintiff's prior cases.  All of the issues raised by Plaintiff are immaterial to the ultimate question of whether the MSQC honestly believed that Dr. Morris' clinical decision-making abilities were in doubt.  *Younger v. Ingersoll-Rand Co.*, No. 1:10-cv-849, 2013 U.S. Dist. LEXIS 141292, at ** 55–56 (S.D. Ohio Sept. 30, 2013) ("[employer's] failure to interview the witnesses identified by [plaintiff] is not sufficient to demonstrate pretext"); *Seeger*, 681 F.3d at 287 ("That [Plaintiff] or the court might have come to a different conclusion if they had conducted the investigation is immaterial").  And an employer's investigation is not required to be perfect.  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2012) ("the decisional process used by the employer [need not] be optimal[.]").  Plaintiff, therefore, has not offered any evidence refuting the findings of the MSQC or MRH's beliefs.

Ultimately, Plaintiff's theory that MRH wanted to force him out, does not establish a genuine issue of disputed fact that Defendant's reasons for its actions were anything other than legitimate.  *Mohanna v. Jake Sweeney Auto.*, No. 1:10-cv-776, 2012 U.S. Dist. LEXIS 97413, at **38–39 (S.D. Ohio July 13, 2012) (plaintiff cannot create an issue of fact as to whether defendant-employer's stated reason is pretext for discrimination "by conclusory statements and subjective

beliefs") (citation omitted).  Because Dr. Morris has not pointed to any evidence demonstrating that the MSQC did not honestly believe its reason for making its recommendations (i.e., doubt regarding his judgment and fitness for duty as one of MRH's General Surgeons), or that MRH did not honestly believe the MSQC when it questioned Dr. Morris' judgment and fitness for duty, Dr. Morris cannot demonstrate pretext.

Additionally, with respect to Plaintiff's allegations that other younger doctors were treated more favorably by MRH, the Court finds that Dr. Morris has failed to present any evidence apart from speculation and hearsay to support his claims.  Plaintiff's conclusory allegations that other General Surgeons experienced adverse outcomes with patients without or with less consequence are, standing alone, insufficient to create a genuine issue of material fact.  *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).  Again, when questioned in his deposition regarding the factual foundation for his allegations of disparate treatment, Dr. Morris repeatedly confirmed his lack of personal knowledge, answering repeatedly that had only heard the information he was relaying "through the grapevine."  (Pl.'s Dep. at 10–24, 26–35, 38–43, 202–211).[4]

Plaintiff has not directed the Court to any evidence of age discrimination in this case by the three external peer reviewers, the MRH physicians comprising the MSQC, Dr. Grant Varian (then-aged aged 71), or Amanda Goble (then-aged 56).  MRH hired Dr. Morris when he was 66 years old, it renewed his employment contracts for eight (8) consecutive years, most recently when he was 73 years of age, agreed to every request he made to increase or decrease his work schedule,

---

[4]  Although the summary judgment standard requires that evidence of record be viewed in the light most favorable to the non-moving party, it does not require that all bald assertions and subjective unsupported opinions asserted by the non-moving party be adopted by a court. "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation."  *Chen v. Dow Chem. Corp.*, 580 F.3d, 394, 400 n. 4 (6th Cir. 2009).

and, despite the fact that he was MRH's lowest producing General Surgeon, adjusted his employment agreements within the confines of its obligations as a not-for-profit hospital to include opportunities for him to earn additional compensation through production-based incentives.  None of these facts is consistent with or demonstrate discriminatory animus.  Plaintiff merely disagrees with MRH's decision, but Plaintiff's second guessing and self-serving opinions do not support a claim of age discrimination.  *See Wright*, 455 F.3d at 708 (refusing to "require that the decisional process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (observing that in determining whether an employer's proffered reason for adverse employment action is pretextual, the plaintiff's perception of his competence, and the incompetence of those competing against him, is irrelevant"); *Braithwaite*, 258 F.3d at 493 (to show pretext, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action.").

Accordingly, Plaintiff cannot prove that Defendant's proffered reason for the imposition of the additional requirements—that one of Plaintiff's patients died following surgery—had no basis in fact, did not actually motivate MRH's challenged conduct, or was insufficient to motivate MRH's challenged conduct.  *Wexler*, 317 F.3d at 576; *Manzer*, 29 F.3d at 1084.  Nor can Plaintiff rebut that Defendant sincerely believed in its reason for its adoption of the MSQC's recommendations following the death of one of Plaintiff's patients within 24-hours of the patient's discharge from MRH.  This case boils down to Plaintiff merely disagreeing with Defendant's conclusion, but he has offered nothing more than his subjective belief that he was a qualified doctor with an excellent record; and it is immaterial that someone else might have reached a different

conclusion. Plaintiff's subjective views in relation to other coworkers, without more, are insufficient to establish discrimination. *Cf. Briggs v. Potter*, 463 F.3d 507, 516-17 (6th Cir. 2006) (holding that a plaintiff's subjective views of his qualifications in relationship to other applicants, without more, fails to establish discrimination). In other words, he has not created an inference that the proffered reason had no basis in fact. Plaintiff has failed to meet his burden of producing sufficient evidence from which a jury could reasonably reject Defendant's explanation of why it imposed additional requirements on his employment. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADEA claim.

### B.    Breach of Contract

Plaintiff alleges in Count II of his Second Amended Complaint that MRH breached his April 1, 2017 employment contract by placing unnecessary restrictions upon his employment and terminating his privileges without a signed agreement.

To establish a breach of contract claim under Ohio law, "a plaintiff must prove the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754 (6th Cir. 2008). There is no dispute that there was an existing contract between Plaintiff and MRH; however, the parties dispute the remaining elements of a breach of contract claim.

MRH asserts that Plaintiff's Employment Agreement provides that Dr. Morris could be subject to hospital oversight. Section 3 of Plaintiff's Employment Agreement titled "Duties and Responsibilities of Physician," required that Plaintiff "meet the quality of care standards established by [MRH] form [sic] time to time for patient care." (ECF No. 12-3, Employment Agreement § 3.4(d)). Plaintiff was also required to comply with MRH's rules and regulations, Medical Staff Bylaws and disciplinary standards and/or actions established by MRH for its employees, as well as "such other policies, procedures, rules and regulations as may be

23

promulgated from time to time by [MRH], including without limitation any and all disciplinary standards and/or actions established by [MRH] for its employees."  (*Id*. at § 3.5(d)).

Plaintiff argues that there is no evidence that he failed to perform his obligations under the Employment Agreement.  He asserts that he satisfactorily completed his duties and obligations pursuant to the agreement and the agreement "does not specifically identify MSQC as a regulatory or authoritative figure that governs Dr. Morris's practice.  Section 3.5(d) only requires that Dr. Morris comply with the hospital's rules and regulations, not the restrictions imposed by each committee."  (ECF No. 41, Pl.'s Resp. at 26).

The Court agrees with Defendant that "it is simply untenable for Dr. Morris to argue that he was not subject to the Medical Staff Quality Committee's oversight because his Employment Agreement 'does not specifically identify the MSQC' or the various other Committees overseeing the Hospital's operations and patient care and safety."  (ECF No. 47, Def.'s Reply at 4).  Therefore, Plaintiff cannot maintain a breach of contract claim on this basis as the broad language of the Employment Agreement provides for general oversight and the imposition of additional requirements by MRH, including committees contributing to the Hospital's management and oversight.

Additionally, Dr. Morris alleges that MRH essentially terminated his privileges and failed to pay him in accordance with the Employment Agreement.  Pursuant to Section 4 of the Employment Agreement, the employment term began on April 1, 2017 and was to continue until March 31, 2018, "unless before the 1st day of December, 2017. . . either party shall notify the other in writing of such party's intention not to continue the term of this Agreement under the same terms and conditions."  (ECF No. 37-1).

There is no dispute that there was no mutual written agreement of the parties to terminate the Employment Agreement.  Defendant argues that Dr. Morris' privileges were not "effectively terminated" as he suggests.  Dr. Morris stated in his deposition that he believed his privileges were suspended because "I was told I could not practice until the -- I could not see patients or practice until I had met the restrictions and requirements that were placed upon me."  (ECF No. 37, Morris Dep. at 141).  However, Dr. Morris did not even attempt to comply with any of the new requirements imposed.  Instead, he requested a meeting with Ms. Goble and "told her that I did not – that I could not practice, that this essentially terminated my privileges.  I said that I think – I think we can agree on a date to stop practicing, and she said yes." (*Id*. at 156).  Further, Dr. Morris admitted his privileges were never suspended.

> Q.   This is circular so I apologize if we're going to do it again. Do you know if your privileges were ever actually suspended?
> A.   Do I know?
> Q.   You told me effectively they were.  I want to know in reality, were your privileges suspended, Doctor?
> A.   No.

(ECF No. 37, Morris Dep. at 163–64).  Plaintiff was further questioned about the agreement he made with Ms. Goble to "stop practicing" or as MRH construed it, his retirement.

> Q.   Did you have subsequent communications with anybody from the hospital after this?
> A.   Yes. They contacted me about the retirement plan. They asked me to turn in my key.  The usual administrative things.
> Q.   So May 3 Mary Rutan sent you something in writing about your retirement, right?
> A.   Yes.
> Q.   And Vickie Crumley in human resources laid out certain things about COBRA, pension, and other things that she identified in the letter to assist you in your retirement, right?
> A.   Yes, in my termination.
> Q.   Did you respond to this letter and say I didn't retire?
> A.   No.

Q.      Did you take the information that Vickie had given you and take steps to start dealing with COBRA and things of that nature?

A.      Yes, I did. I wasn't given a choice, but I did what she asked me to do.

(*Id.* at 167–69).

Plaintiff urges this Court to find that he was effectively terminated because the restrictions placed on him would not allow him to continue to practice.  The Court does not agree.  The requirement that Plaintiff perform ten lower bowel surgeries did not terminate his ability to practice.  It was limited to lower bowel surgeries only and did not restrict him from performing other surgical procedures he would otherwise perform as a general surgeon.  And despite Plaintiff arguing that the proctor requirement would have been impossible, he never attempted to schedule a surgery with a proctor.  Further, he admits the other requirements were not that restrictive:

Q.      I don't recall you telling me you weren't allowed to do lower bowel surgery, you had to have a proctor?

A.      Yeah, that's what the restriction said, without a proctor. My point is —

Q.      Were there any situations where you said all right, I'm going to go with this and a proctor wasn't available?  Did you ever give that a chance?

A.      No, I never got to that point because I understood that this essentially eliminated any chance that I – this essentially terminated my privileges.

                               *      *      *

Q.      You said that your privileges were terminated, and you've told me that one of the reasons was that you couldn't perform lower bowel surgeries without a proctor present?

A.      Right.

Q.      Were there any circumstances -- did you say I'll try and you tried to schedule a procedure and there was no proctor? Did that ever happen?

A.      It never happened.

Q.      Because you didn't let it happen?

A.      I did not.

Q.      Because you retired before then?

A.      I did not retire.  I was 13 essentially forced out.

                               *      *      *

Q.      So what were the other restrictions?

A.      The other restrictions were basically they wanted a neuropsychiatric examination.  Neuropsychological.

Q.      Okay. What would that involve?

A.      That would probably involve meeting with a neuropsychiatrist, but there was no basis for that at all.

Q.      Hang on. I didn't ask about the basis.  I asked what it involved.

A.      Okay.

Q.      So what would that involve?  You meet with the neuropsych doctor, that's it?

A.      Yes.

Q.      The neuropsych doctor, what, just talks to you for a little bit and fills out a form?

A.      I don't know.

Q.      Did you ask?

A.      No.

Q.      So as far as you know, the neuropsych exam involved nothing more than you meeting with a neuropsych doctor, correct?

A.      Yes.

Q.      Tell me the next restriction that was imposed at this April 28th meeting.

A.      Physical exam.

Q.      What would that have involved?

A.      A physical examination and history.

Q.      So meeting with, what, some general practitioner or some other doctor and having an exam?

A.      Yes.

Q.      Is there anything complicated about that?

A.      No.

Q.      Any idea how long that might have taken?

A.      A few hours.

Q.      Okay.  So we've got no lower bowel unless you do ten with a proctor, a neuropsych exam, a physical exam that would have taken a couple hours.

A.      Right.

Q.      Is there any reason why you couldn't have participated in a neuropsych exam?

A.      No.

Q.      Were you unable to?

A.      No.

Q.      Were you able to participate in a physical exam at that time?

A.      Yes.

Q.      Were there any other restrictions besides these three being described?

A.      I think it was recommended that I take a course on progress note writing.

Q.      Did you ask what that would involve?

27

A.     No.

Q.     Any idea what that would involve?

A.     No.  Probably a few hours of education.

Q.     Probably go on the computer and click through for a couple hours?

A.     Probably.

Q.     Okay.  Were you able to complete the progress note writing course?

A.     I did not.

Q.     Were you able to, sir?

A.     Yes.

Q.     Okay.  Were there any other restrictions that you were told would be imposed on you other than the ones you specifically described?

A.     No.

Q.     During this meeting on April 28th did you voice any objection at all to any of these restrictions?

A.     Yes, I told Mrs. Goble it was quite unfair.  Oh, in the meeting?

Q.     Yes, sir.

A.     With the committee?

Q.     Yes, sir.

A.     I did not.

Q.     Did anything else happen during that meeting other than them identify these restrictions to you, sir?

A.     No.

Q.     How did the meeting end?

A.     They said do you have any questions. I said no.

(*Id*. at 144–149)

Based on Plaintiff's own testimony, he chose not to perform the new requirements placed on him and therefore he cannot establish the second element of a breach of contract claim—performance by Plaintiff.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.

### C.     Americans with Disabilities Act

Plaintiff asserts that MRH violated the ADA, 42 U.S.C. §12112(d), "by demanding and requiring that Plaintiff undergo unlawful medical examination(s) during his employment with Defendant.  (ECF No. 19, Second Am. Compl. ¶ 84).  Plaintiff further asserts that "the unlawful

medical examination(s) include, but are not limited to: requiring Plaintiff to undergo a neuropsychological evaluation, requiring Plaintiff to undergo a physical examination, requiring that reports of Plaintiff's neuropsychological and physical evaluations be provided to Defendant, and compelling Plaintiff, as a condition of his employment, to participate in medical evaluations under Defendant's terms, among other things." (*Id*. ¶ 85). Plaintiff argues that the additional requirements "exceeded the scope of any acceptable medical examination" and were not job-related or consistent with a business necessity. (ECF No. 41, Pl.'s Resp. at 32–33).

The ADA prohibits an employer from "require[ing] a medical examination" or making "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 121112(d)(4)(A).

To demonstrate compliance with the ADA, MRH must therefore demonstrate that a post-hiring request for examination is job-related and consistent with business necessity. However, Defendant, relying on *Sullivan*, 197 F.3d at 812, argues that plaintiff cannot establish a genuine issue of material fact as to whether the exams were job-related or too broad in scope because he failed to submit to the alleged improper examinations. Plaintiff counters that he is only required to show that Defendant either performed or authorized a medical examination or disability inquiry, but not both. (ECF No. 41, Pl.'s Resp. at 28 (citing *Kroll v. White Lake Ambulance Auth. (Kroll II)*, 763 F.3d 619, 623 (6th Cir. 2014) and *Bates v. Dura Auto. Sys., Inc. (Bates II)*, 767 F.3d 566 (6th Cir. 2014)). He argues that the medical examination does not actually have to be conducted, only that it was authorized by the employer.

In *Kroll II*, the Sixth Circuit found there was a genuine issue of material fact regarding whether the psychological counseling ordered by plaintiff's employer was "job-related and

consistent with business necessity." *Kroll II*, 763 F.3d at 627 (vacating the district court's grant of summary judgment to the employer, finding a genuine issue of fact regarding whether prescribing psychological counseling to an employee constituted an impermissible medical examination under § 12112(d)(4)(A)). Kroll did not complete the counseling ordered by her employer, but the Sixth Circuit did not address this issue as a requirement for maintaining an ADA claim. The Court remanded based on the lack of sufficient objective evidence to conclude that Kroll was impaired in the performance of her essential job functions or that she posed a threat to the safety of others, justifying the imposition of counseling. *Id*.

In *Bates*, the Sixth Circuit addressed whether the employer's drug testing constituted a medical exam under the ADA. 767 F.3d at 580. Similar to *Kroll*, the *Bates* Court did not address the *Sullivan* precedent regarding whether a medical examination actually had to be performed to bring a claim.

Here, Plaintiff admits that he neither completed nor attempted to complete any element of the MSQC's recommendations, including the medical examinations he alleges were improper. (ECF No. 37, Pl.'s Dep. at 145). The Court finds that Plaintiff's failure to submit to the examinations, in and of itself, entitles Defendant to judgment in their favor on Plaintiff's ADA claim. *Sullivan*, 197 F.3d at 812; *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 249 (6th Cir. 2009)(because the plaintiff did not undergo the functional capacity evaluation, he was precluded from raising a genuine issue as to whether the exam was job-related or too broad in scope).

Even if Plaintiff's failure to submit to the medical exams did not bar him from bringing an ADA claim, the Court finds that the MSQC recommendations adopted by MRH were job-related and consistent with business necessity. As a General Surgeon, Plaintiff agreed that he was dealing

with the lives of MRH patients every time he operated, a great responsibility. Plaintiff agrees that the post-operative death of his patient in April 2017 was unexpected and the outside review was both necessary and justified. After review of the deceased patient's case by three external, unbiased General Surgeons, each of the three explicitly questioned Plaintiff's operative decision-making. The peer reviewers made the following determinations in their reports regarding Plaintiff's decision-making and care of the patient:

- "The operative decision-making is well below the standard of care and in my surgical opinion indefensible." (ECF No. 36, Varian Dep. Ex. 6).

- "The … surgical decision to perform a primary anastomosis is unsettling and goes against most every surgical tenet." (*Id*.).

- "This decision [to discharge the patient] does not meet the standards of care." (*Id*.).

- "[T]he operation performed and the discharge timing is in many ways incomprehensible from a surgical vantage point." (*Id*.).

- "[A]n excessive operative time and a poor intraoperative decision to reconnect the colon in this [] patient contributed to his demise." (*Id*. at Ex. 5).

- "I feel that his surgical treatment fell below the standard of care…Documentation also fell below the standard of care in this patients' treatment." (*Id*. at Ex. 4). Two of the peer review reviewers also specifically questioned whether Plaintiff required assistance in the operating room. (*Id*. Ex. 5 and Ex. 6).

Based on the aforementioned reports, the MSQC and MRH had legitimate reasons to doubt Plaintiff's capacity to perform lower bowel surgeries and legitimate reasons to take proactive steps to ensure patient safety. *See Barnum v. Ohio State Univ. Med. Ctr.*, 642 Fed. App'x 525, 533 (6th Cir. 2016) (psychological evaluation of a Certified Registered Nurse Anesthetist was job-related and consistent with business necessity where the defendant was informed of concerns regarding the plaintiff's inability to concentrate and one instance where she could not perform a routine task); *Sullivan*, 197 F.3d at 812 (citing *Pesterfield v. TVA*, 941 F.2d 437 (6th Cir. 1991)) (upholding

mental and physical exams as a precondition to returning to work); *Pena v. City of Flushing*, 651 F. App'x 415, 422 (6th Cir. 2016)(an employer can require a mental and/or physical examination as a condition of returning to work).

      Furthermore, the Court finds that the recommendations made by the MSQC were no broader or more intrusive than necessary. Plaintiff's privileges with MRH were not suspended or revoked. MRH believed that the additional requirements were necessary to ensure confidence in Plaintiff's fitness to perform his job as a general surgeon. (ECF No. 36, Varian Dep. at 53–54, 63–64; ECF No. 35, Goble Dep. at 66). As the Medical Director, Dr. Varian, testified:

> The committee was concerned about decision-making. The committee was concerned about judgment. The committee did not have any idea the extent of the issue. They just knew that they felt that this was a problem, or there might be a problem that needed to be addressed. The committee did not want to affect [Plaintiff's] privileges, but they wanted to be reassured that [Plaintiff] was okay and fit to do these procedures. The committee was trying to come up with some way to regain that confidence…

(ECF No. 36, Varian Dep. at 63–64).

      Finally, Plaintiff's own testimony affirms Defendant's position that completing the additional requirements, including the medical and neuropsychological examinations, would have been neither onerous nor time intensive. (ECF No. 37, Pl.'s Dep. at 146–148). Therefore, the Court finds that Defendant's imposition of additional requirements was neither overbroad nor intrusive and was reasonable, given the circumstances, to ascertain Plaintiff's decision-making capabilities with respect to only lower bowel surgeries (and not the myriad of other surgeries Plaintiff performed as a general surgeon). Defendant MRH is entitled to summary judgment on Plaintiff's ADA claim.

## IV.    CONCLUSION

For the foregoing reasons, MRH's Motion for Summary Judgment is **GRANTED**.  The

Clerk shall enter final judgment in favor of Defendant and remove ECF Nos. 33 and 34 from the

Court's pending motions list.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  October 7, 2020**